UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

JOHN CORNISH                                    :        Civil Action No.
                                                :        14-cv-6920
                                                :
                      Plaintiff                 :
            v.                                  :
                                                :
CITY OF PHILADELPHIA (PICC, CFCF)  :
PENNSYLVANIA DEPARTMENT          :        JURY TRIAL DEMANDED
            OF CORRECTIONS'                :
            Director of Health Services    :
            Christopher Oppman             :
CORRECTIONS HEALTH CARE          :
            ADMINISTRATORS OF DOC     :
            SCI Graterford, Joseph Korszniak :
            SCI Camp Hill, Teresa Law     :
WEXFORD HEALTH SOURCES, INC   :
PRISON HEALTH SERVICES INC       :
CORIZON                                       :
CORRECT CARE SOLUTIONS, LLC     :
CCS CORRECTIONAL HEALTHCARE   :
JOHN DOE CORPORATIONS 1-5         :
JOHN DOE PHYSICIANS 1-5             :
JOHN DOE CR NURSE PRACTITIONERS:
JOHN DOE NURSES                         :
JOHN DOE PHYSICIAN ASSISTANTS  :
                      Defendants            :
_____

**FIRST AMENDED COMPLAINT**

John Cornish, through counsel, avers as follows:

**Parties**

1.       John Cornish is an adult individual who is currently incarcerated at the State

Correctional Institution at Camp Hill, Pennsylvania ("SCI Camp Hill").  At various time

pertinent to this complaint, he was incarcerated at Philadelphia Industrial Correctional Center

("PICC"), Curran-Fromhold Correctional Facility ("CFCF") and SCI Graterford.  Mr. Cornish

entered the prison system in January 2009.

2.      Both SCI Camp Hill and SCI Graterford are correctional facilities operated by the

Pennsylvania Department of Corrections.

3.      Both PICC and CFCF are correctional facilities managed and operated by

Philadelphia Department of Human Services, also known as the Department of Public Welfare,

and the board of trustees of prisons.

4.      Defendant City of Philadelphia at all material times was a political subdivision and

municipal corporation duly existing and organized under the laws of the Commonwealth of

Pennsylvania receiving federal and/or state funding and with a place of business at the above

captioned address.  It operates PICC and CFCF and provides medical services through

defendants Corizon and/or Wexford.

5.      Pennsylvania Department of Corrections ("DOC") at all material times was a

government agency operating correctional facilities within the Commonwealth of Pennsylvania

receiving federal and/or state funding and with a place of business at the above captioned address

whose Medical Director is defendant Christopher Oppman.  DOC from time to time contracts

with private companies to provide services to its correctional facilities.

6.      Defendants Corrections Health Care Administrators ("CHCA") are responsible for,

including but not limited to, monitoring the health care providers' medical services provided to

inmates at DOC facilities, ensuring their contracts are followed and that constitutional medical

care is provided.  It is believed and therefore averred that at the relevant time CHCA at SCI

Graterford was defendant Joseph Korszniak and defendant Teresa Law is the CHCA at SCI

Camp Hill.

7.     Defendants Oppman, Korszniak and Law are DOC employees and are referred to herein together with DOC where individual actions are performed.  ("DOC")

8.     Wexford Health Sources Inc. ("Wexford") is a Florida corporation and has been contracted by PICC and/or DOC to provide health care services, including ophthalmology services to prisoners at PICC as well as at DOC institutions.  Wexford receives federal and/or state funding to perform services.  At all times it acted under color of state law.  Plaintiff is asserting a professional liability claim against this defendant.

9.     Defendant Corizon (formerly known as Prison Health Services, Inc. some contracts may still be in this name) ("Corizon") is a corporation or similar business entity doing business within the Philadelphia prison system and for correctional facilities operated by DOC.  Corizon receives federal and/or state funding to perform services.  At all times it acted under color of state law.  Plaintiff is asserting a professional liability claim against this defendant.

10.     Defendant Correct Care Solutions, LLC  ("CCS") is a wholly owned subsidiary of CCS Correctional Healthcare and is a corporation or similar business entity doing business within the correctional facilities operated by DOC.  CCS receives federal and/or state funding to perform services.  At all times it acted under color of state law.  Plaintiff is asserting a professional liability claim against this defendant.

11.     Defendant CCS Correctional Healthcare ("CCSCH") is a corporation or similar business entity doing business within the correctional facilities operated by DOC.  CCSCH receives federal and/or state funding to perform services.  At all times it acted under color of state law.  Plaintiff is asserting a professional liability claim against this defendant.

12.     Defendant John Doe Corporations 1-5 are to date unknown corporations or similar business entities doing business within the Philadelphia prison system and for correctional

facilities operated by DOC that may have operated in facilities housing plaintiff during the relevant time frame of this complaint. They receive federal and/or state funding to perform services. At all times they acted under color of state law.

13.     Defendant John Doe Physicians 1-5 are to date unknown physicians doing business within the Philadelphia prison system and for correctional facilities operated by DOC for Wexford, Corizon or CCS/CCSCH that may have operated in facilities housing plaintiff during the relevant time frame of this complaint. They receive federal and/or state funding to perform services. At all times they acted under color of state law and by and through their employers for the employers benefit. They acted within the course and scope of their employment and/or agency and in furtherance of the business and affairs of Corizon, Wexford or CCS/CCSCH. They may be subject to a professional liability claim. They are also sued in their individual capacity.

14.     Defendant Nurses 1-5 are to date unknown individuals doing business within the Philadelphia prison system and for correctional facilities operated by DOC for Wexford, Corizon or CCS/CCSCH that may have operated in facilities housing plaintiff during the relevant time frame of this complaint. They receive federal and/or state funding to perform services. At all times they acted under color of state law and by and through their employers. They acted within the course and scope of their employment and/or agency and in furtherance of the business and affairs of Corizon, Wexford or CCS/CCSCH. They may be subject to a professional liability claim. They are also sued in their individual capacity.

15.     Defendant Physician Assistants 1-5 are to date unknown individuals doing business within the Philadelphia prison system and for correctional facilities operated by DOC for Wexford, Corizon or CCS/CCSCH that may have operated in facilities housing plaintiff during

4

the relevant time frame of this complaint.  They receive federal and/or state funding to perform services.  At all times they acted under color of state law and by and through their employers. They acted within the course and scope of their employment and/or agency and in furtherance of the business and affairs of Corizon, Wexford or CCS/CCSCH.  They may be subject to a professional liability claim.  They are also sued in their individual capacity.

16.     Defendant CR Nurse Practitioners 1-5 are to date unknown individuals doing business within the Philadelphia prison system and for correctional facilities operated by DOC that may have operated in facilities housing plaintiff during the relevant time frame of this complaint.  They receive federal and/or state funding to perform services.  At all times they acted under color of state law and by and through their employers.  They acted within the course and scope of their employment and/or agency and in furtherance of the business and affairs of Corizon, Wexford or CCS/CCSCH.  They may also be subject to a professional liability claim.

## Jurisdiction and Venue

17.     This Complaint includes claims made pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983 and this Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

18.     This Complaint also includes pendent state law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because the complaint arose in the City of Philadelphia while plaintiff was housed at PICC, the harm continued as he was transferred to and from various correctional facilities.  A substantial part of the events or omissions giving rise to this claim occurred within the City of Philadelphia.  Defendants are subject to personal jurisdiction in this Court.

**Factual Allegations**

20.     Under both the Philadelphia and DOC medical contracts with vendors, which vendors include Wexford, Corizon and CCS, the vendor employs practitioners (Physician, CRNP and PA), and administrative staff.  One vendor employs nursing staff at two facilities.  Philadelphia and DOC employ nurses and administrative staff at other facilities.

21.     Records reviewed do not disclose, with limited exception, the employer for whom the practitioner works.  The names of the people making entries into Mr. Cornish's medical record in most cases are unreadable.

22.     It is believed and therefore averred that employees of the City of Philadelphia and DOC were involved in Mr. Cornish's medical care which employees will be revealed once the entries in the medical records are clarified.

23.     The scope of work under the medical contracts includes intake history and physical exam; chronic disease management; inpatient hospital monitoring; daily sick call and physician sessions; long term care; emergency services; vision care.  It also provides for referral to outside specialists.

24.     The DOC has undertaken a number of cost saving initiatives to reduce the cost of inmate care including use of CRNP, PA's, Nurse Assistants, telemedicine for chronic care, pre and post hospital care and use of electronic medical records.

25.     Other cost savings initiatives are capping inpatient services at Medicaid rates; DPW billing; outpatient services capped at Medicare rates, billing by vendor; review of access to care, including specialty care and chronic disease management.

26.     DOC has acknowledged that quality inmate health care requirements include adherence to ACA correctional standards and clinical protocols; extensive clinical and quality

improvement monitoring processes; trained health care staff and proactive partnerships with medical vendors.

27.     The DOC understands that the history of contracted prison healthcare in Pennsylvania is a history of unrealized cost savings, lawsuits and diminished care.

28.     It is believed and therefore averred that at the relevant time the CHCA at SCI Graterford, Joseph Korszniak; the DOC Director of Health Services, Christopher Oppman; and Teresa Law, the CHCA at SCI Camp Hill, knew about and acquiesced in the medical providers failure to treat Mr. Cornish's eye condition.

29.     In 2010-2013 it is believed and therefore averred that Mr. Cornish was housed at Curran-Fromhold Correctional Center ("CFCF") and later at the Philadelphia Industrial Correctional Center ("PICC") both operated by the City of Philadelphia.

30.     At some point, he developed symptoms including blurred vision, sensitivity to bright light, problems seeing at night, and headaches.

31.     His vision became worse and was cloudy and he experienced pain in his eye.

32.     Mr. Cornish was seen at Soll Eye in Philadelphia, who gave him glasses and eye drops.

33.     Inmates are not given documents after outside appointments, the provider is instructed by the prison or Corizon or Wexford to either fax the information to the prison or it is given to the prison guards who are supposed to return the paperwork to the prison.  An inmate thus never knows when, or if, he will next be seen by an outside provider, and doesn't know what, for example, medicine was prescribed..

34.     The Philadelphia Prison System itself, operated by the City of Philadelphia, directs outside provider payments through its Regional Medical Director and the Chief of Medical

Operations for the Philadelphia Prison Systems.  That system has caused unnecessary delays and lack of continuity in the treatment of Mr. Cornish.  Those people knew that Mr. Cornish was not receiving adequate care because they were key in obtaining outside provider visits, which Mr. Cornish required.

35.     It is believed and therefore averred that the medical vendors and the prison systems understand and agree that serious illness, such as Mr. Cornish's condition, is expensive to treat, and will be handled by outside providers only when the condition can no longer be ignored.

36.     Visits to outside providers are not followed through once the inmate returns to the prison.

37.     Numerous times within the outside provider records, involving referrals from both the Philadelphia Prison System and the DOC facilities, are notations of failure to pay for necessary care for Mr. Cornish's eye condition.

38.     Former DOC Corrections Secretary Jeffrey A. Beard has been quoted "Continuity of inmate care is a matter of importance to the department."

39.     Notwithstanding this statement, to date Mr. Cornish's care has had no appropriate continuity, nor has DOC set forth any plan to remedy the severely deficient care received.

40.     Mr. Cornish's medical history did not follow him, or his medical transfer form did not contain information about his eye condition, as he was transferred from prison to prison, leading to lack of care and failure to follow up on critical appointments, examinations and medications. For example when he entered one DOC facility his eyesight was noted as normal and that capsaicin could be used as a method of inmate control.  This use is contraindicated when there is a known medical condition of the eye.

41.     On April 19, 2012, Mr. Cornish, at the time 22 years old, was seen at Wills Eye Ophthalmology Clinic, to be evaluated for KCN or Keratoconus.

42.     An examination was performed and the impression was Keratoconus and corneal scar, central.

43.     He was prescribed Prozac 40 mg every day.

44.     He was to be referred to corneal for evaluation and possible Penetrating Keratoplasty ("PK") OS (left eye) and referred to CL clinic for RGP (rigid gas permeable) lenses for his right eye.  His chart noted that visual potential appeared to be much better OD (right eye) than OS (left eye) at that time.

45.     In follow-up he was to get the next available appointment with corneal and the next available contact lens clinic.

46.     On June 28, 2012, Mr. Cornish came to the CPEC Service Clinic.  His record notes that he was supposed to have RGP fitting but never had it done.  CPEC referred Mr. Cornish to Wills Eye.

47.     He was to continue Prozac 40 mg every day and 10 mg Claritin as ocular medication.

48.     His vision had continued to deteriorate.  He had a RGP contact lens fitting.

49.     His records note he may be a candidate for collagen crosslinking after attempting RGP first.  He was told to use artificial tears as needed to avoid irritation and eye rubbing.

50.     He was to follow-up in cornea clinic after the RGP fitting to evaluate fit and for follow-up to contact lens in next several weeks.

51.     On October 3, 2012 Mr. Cornish was seen at Wills Eye Ophthalmology Clinic Cornea Service.

52.     He saw a contact lens consult but was unable to have lens fit for left eye due to KCN but did have lens for right eye which improved vision.  Mr. Cornish was awaiting this lens which had to be designed and ordered.  He was at the clinic for evaluation of his left eye.

53.     The plan discussed was for possible PK surgery with discussion of risks and need for additional surgery because of his young age.  Follow up was to be in 4 months.

54.     In November 2012, Mr. Cornish was still housed PICC.

55.     On November 2, 2012, Mr. Cornish was seen again by a physician at Wills Eye Ophthalmology Clinic in Philadelphia Cornea Service and was evaluated for PK.  It was noted he was incarcerated.

56.     Penetrating Keratoplasty (PK) refers to the replacement of the host cornea with a donor cornea. It is used with success in patients with decreased visual acuity secondary to corneal opacity, in the treatment of corneal thinning or perforation, for the removal of non responding infectious foci and for the relief of pain.  It is used to treat Keratoconus.

57.     Upon examination Mr. Cornish's eyes showed keratoconus, left eye greater than right.

58.     Keratoconus occurs when the cornea, the clear, dome-shaped front surface of the eye, thins and gradually bulges outward into a cone shape.

59.     A cone shaped cornea causes blurred vision and may cause sensitivity to light and glare.

60.     In the early stages of keratoconus, vision problems can be corrected with glasses or soft contact lenses.  As it progresses, a special rigid gas permeable contact lens is needed. Advanced keratoconus may require surgery.

61.    In advanced keratoconus, the cornea may become scarred which causes worsening vision problems and requires surgery.

62.    His vision in his right eye was measured at 20/400 and in his left as unable to count fingers at nine feet.

63.    The plan was to give Mr. Cornish a hard contact lens for his right eye on 11/5/12 and undergo a corneal transplant in his left eye, (keratoplasty) which was to be scheduled as soon as possible.

64.    Mr. Cornish described his vision as looking through a cracked windshield.

65.    The chart notes that a history and physical report was generated and faxed and that medical clearance was required.

66.    The medical clearance required was for a complex sub-specialist.  The chart notes that pre-op instructions were discussed, explained and understood by Mr. Cornish.

67.    The impression on this date was keratoconus, unspecified; central opacity of cornea and hordeolum, which is a localized infection of the eyelid margin.

68.    A hordeolum usually is painful, erythematous, and localized. It may produce edema of the entire lid. Purulent material exudes from the eyelash line in external hordeola, while internal hordeola suppurate on the conjunctival surface of eyelid.

69.    The chart notes that although Mr. Cornish was able to be fitted with a lens in his right eye which demonstrated improvement the lens was NEVER dispensed. (emphasis in chart)

70.    The doctor spoke with contact lens department which indicated the lens was ready to be picked up and an appointment was made for November 5, 2012.

71.    On April 4, 2013,Mr. Cornish had a corneal transplant done by Brandon Ayers MD of Wills Eye Hospital.  At the time he was incarcerated at PICC.

72.     Any surgery would require extensive healing time.

73.     On July 23, 2013, Mr. Cornish was seen at Milton S. Hershey Medical Center for acute rejection of PK.  Mr. Cornish was then at SCI Camp Hill.  The description was eye swelling, headache, vision loss in left eye, facial swelling, left sided weakness.  He was given steroid drops for his eye and told to follow up with his surgeon at Wills Eye within one week.  It was also noted he needed the rigid lens for the right eye.  Mr. Cornish said he had migraines. The chart noted he was moved to SCI Camp Hill and he was unable to get a refill on his prescribed eye drops.  He reported he had swelling around his eye, which was increasing, and burning throbbing headaches.  He reported that two weeks prior he woke up with no vision in his left eye.

74.     Hershey Medical Center diagnosed uveitis and corneal transplant rejection.  Their ophthalmology service wanted to see him immediately.  They agreed with the diagnosis.  He was discharged back to prison with prescriptions for Pred Forte ("PF") 1% ophthalmic suspension and Vigamox ophthalmic solution.  They told Mr. Cornish he needed long term eye drops to prevent future rejection.  The chart note emphasizes that "it is CRITICAL you see your ophthalmologist at Wills Eye" within a week.  They warned he could lose the transplant.  They further emphasized that "You MUST get your drops as prescribed."  The same message was given to the guards from the prison who were instructed to take the instructions back to the prison medical.

75.     Mr. Cornish was seen by the Cornea Service at Wills Eye Hospital on September 27, 2013.

76.     Wills Eye chart notes indicate that Mr. Cornish did not receive PF from late May until July 21, 2013, that his vision had declined significantly and that he had a facility transfer.  The

chart notes that Mr. Cornish was seen in the ER and PF was restarted mid September 2013. It notes that there was no improvement in Mr. Cornish over the last month despite aggressive steroids and would likely need a repeat PK. The chart also notes that he still has not obtained the lens needed for his other eye because payment was not made. The doctor provided instructions to prison medical to arrange for payment of the lens.

77.     On December 9, 2013, Mr. Cornish was seen at Wills Eye Hospital Cornea Service. The chart notes he now had keratoconus in both eyes. No improvement was noted since September. Was using PF six times a day. His corneal graft was edematous with rejection noted. No improvement. Mr. Cornish was told of risk of glaucoma/steroid induced cataract. The chart notes that Mr. Cornish had not received the needed RGP lens. The doctor provided instructions to prison medical for THIRD time to arrange payment for RGP for OD (right eye).

78.     At one point, in pain and desperate to be seen for his eye condition, Mr. Cornish stated in a telephone call that he wasn't being seen for his deteriorating eye condition he said he would have to break out to go to the doctor.

79.     Shortly after that phone call, and based on the monitoring of that recorded phone call, Mr. Cornish was sent to the RHU on an "escape" charge. The charge was ultimately dismissed, but despite the serious medical condition, his eyes were not cared for.

80.     While at SCI Graterford he was not properly medicated for his eye problem which ultimately triggered a rejection of the transplant. His health crisis was not addressed at all and he was transferred to SCI Camp Hill.

81.     At his visit to Wills Eye in February 2014 it was recommended that he have a follow-up visit within 4-6 weeks.

82.     Mr. Cornish was transferred from SCI Graterford to SCI Camp Hill April 30, 2014 without returning to Wills Eye for any follow up.

83.     It is believed and therefore averred that Mr. Cornish was on A Block at SCI Camp Hill from May 2, 2014 to July 20, 2014.

84.     Upon his arrival he notified the intake nurse of his condition.  She scheduled him to see the optometrist as soon as possible.

85.     Mr. Cornish was in sick line at SCI Camp Hill in May 2014 and saw an optometrist who scheduled Mr. Cornish for an outside visit with a specialist.

86.     Despite having a swollen face and discolored eye and extremely poor vision, he was housed in general population, not in the infirmary.  His stitches from his surgery were still in his eye.

87.     Mr. Cornish was admitted to Hershey Medical Emergency Room a few days later after his assigned psychiatrist noticed his swollen face and discolored eye.

88.     At the emergency room he was examined and given medication and referred to the doctor that performed the surgery.

89.     Mr. Cornish was in sick line at SCI Camp Hill in June 2014 for a follow-up visit to determine why it was taking so long to see a specialist.  The practitioner informed Mr. Cornish that his outside appointment had been approved, it was just a matter of when the visit was to be scheduled.  As of August 15, 2014 the visit had not been scheduled.

90.     Mr. Cornish was sent back to SCI Graterford.  He did not see his doctor at Wills Eye until August, 2014 and then made visits to Wills Eye to rehabilitate from the transplant rejection to try to avoid more surgery.

91.     The staff at Wills Eye contacted SCI Graterford multiple times concerning insurance payments that would allow Mr. Cornish to obtain additional care, specifically a hard contact lens for his right eye where the vision had deteriorated because of the strain put on it from the transplant rejection in his left eye.

92.     Mr. Cornish entered the RHU on July 20, 2014 and made several requests for his eye drops from his property, which as of August 15, 2014 were unanswered.

93.     On April 7, 2014, Mr. Cornish requested from Mrs. Clarke a copy of his medical records so he could have personal knowledge of his medical condition and know the names of his nurses and healthcare providers.  There was no response to that request.

94.     On April 10, 2014 Mr. Cornish requested a copy of his medical records so he could be knowledgeable about his situation.  On April 12, 2014 the request was refused by C. Kozak RN who stated that "you have to have court order with Docket # in order to have this"

95.     On August 7, 2014, Mr. Cornish made a request for his medical records.  L. Astore responded on August 12, 2014:  "Mr. Cornish I am not permitted to give you the copies that you are requesting unless you are representing in a legal and active court case and can prove that such a case exists.  Thank you."

96.     On September 7, 2014, from the RHU, Mr. Cornish requested medical staff supply his antibiotic eye ointment as prescribed by Hershey Medical Center.

97.     On September 14, 2014, he finally received his antibiotic eye ointment prescribed on August 19, 2014.

98.     On September 18, 2014, Mr. Cornish made another request for his medical records. He has not received them.

99.     Twice in the fall of 2014, Dr. Boggio came to Mr. Cornish's cell posing as an assistant for the medical department.  Mr. Cornish had complained about not getting his medications and Dr. Boggio apologized and blamed the nurses.  He also claimed to have received the paperwork from the ophthalmologist on September 17, 2014 and that is why Mr. Cornish had not been seen medically since August 19, 2014.

100.     Mr. Cornish witnessed the doctor hand the DOC guards the paperwork at the end of that doctor visit, just as they did every visit, so he knew that the paperwork was with the officers.

101.     At this time Mr. Cornish still had stitches in his eye from the surgery.

102.     Mr. Cornish has permanent damage to his left eye.  His vision in that eye will never be fully clear and is extremely blurry in the morning taking a few hours to clear to hazy, which is the best it gets.  He has developed a cataract and will have to use eye drops the rest of his life.

103.     The only possible alternative is additional surgery, which is highly risky because the eye is now less susceptible to accepting a transplant.

104.     In addition to the already severe condition of his left eye, his right eye is more damaged than it was because of SCI Graterford's failure to make necessary insurance payments for the rigid lens.

105.     This extreme neglect of his eyesight continues because Camp Hill scheduled him for an outside visit and it has not occurred at the time the first complaint was filed.  It is unknown whether Mr. Cornish has now been seen by proper medical providers subsequent to the filing of his first complaint.

### COUNT ONE
### Americans with Disabilities Act Claim

106.     Plaintiff incorporates herein by reference all averments set forth in the preceding paragraphs as though same were set forth in full herein.

107.    Defendant's conduct violated the Americans with Disabilities Act (Pub. L. 101-336, 104 Stat. 327, 42 U.S.C. §§ 12101-12213 and 47 U.S.C. §§ 225 and 611).

108.    Plaintiff suffered physical impairment that substantially limited one or more major life activities, and Defendants knew of his history of such an impairment.

109.    Plaintiff was denied the benefits of defendants' medical service.

110.    The denial of medical services was by reason of his disability.

111.    The provision of outside medical care and subspecialists for ophthalmology care is expensive for defendants and it is believed and therefore averred his eye condition is the reason he was denied appropriate care both in the Philadelphia Prison System and at DOC.

112.    In denying proper medical care to Plaintiff, defendants knew that a harm to a federally protected right was substantially likely, and failed to act upon that likelihood.

WHEREFORE, plaintiff respectfully demands a jury trial, requests relief and judgment in his favor and against defendants and for actual, compensatory, and consequential damages (where allowed) including pain and suffering according to proof, in excess of $100,000; for punitive or exemplary damages as permitted by applicable law, in an amount believed by the trier of fact to be appropriate to punish defendants for their willful, deliberate, malicious and outrageous conduct, and to deter defendants and other employers from engaging in such misconduct in the future; for attorneys fees, costs and expert fees; for prejudgment interest including delay damages; constitutional damages allowed by law; for prospective and equitable relief in that defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom and are to be ordered to promulgate an effective policy against such practices and to adhere thereto and for such other, different or further relief as the interests of justice or equity may require.

**COUNT TWO**
**42 U.S.C. §§ 1983, 1985(3) and 1986**

113.    Plaintiff incorporates herein by reference all averments set forth in the preceding paragraphs as though same were set forth in full herein

114.    The state prison system manages and directs defendant as a contractor for medical services.  Defendant contractor makes large sums of money for providing deficient services to incarcerated individuals unable to get medical care elsewhere.

115.    Defendants City of Philadelphia and DOC operate the prisons where plaintiff was housed and are responsible for supervision, oversight, direction and control of agencies departments, operations and functions, including the medical vendors.

116.    Defendants City of Philadelphia and DOC are responsible for establishing and enforcing policies and procedures to ensure the safety, health and availability and provision of adequate medical treatment to all inmates at the prisons.

117.    At all times relevant hereto the prison and defendants had actual knowledge that defendant personnel were to treat prisoners pursuant to constitutional medical standards, knew they were not so treated and did nothing.

118.    Despite their actual knowledge of those unconstitutional and unlawful practices, neither the prison system nor defendants has taken steps to prohibit these practices even after numerous lawsuits and settlements.

119.    Neither DOC nor its officials has proposed any remedy to conform Mr. Cornish's medical treatment to constitutional medical standards.  It is believed and therefore averred that problems with payments, continuity and follow-up appointments for his eye condition persist.

120.    By inaction in the face of actual knowledge defendants implicitly and explicitly tolerate, sanction and approve of these practices.

121.    On information and belief, defendants do not train or supervise their personnel in the appropriate manner in regard to constitutional medical care for prisoners with vision problems or eye disease.

122.    Such actions are defendants' policy and practice.

123.    Wexford and/or Corizon and/or CCS and CCSCH also acted through and together with the City of Philadelphia and DOC to deny medical care to Mr. Cornish in part, it is believed and therefore averred, because of the expense of outside specialists to treat his condition.

124.    Defendants were deliberately and/or recklessly indifferent to plaintiff's serious medical needs relating to his eyes and thereby violated Plaintiff's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and/or Plaintiff's right to due process of law under the Fourteenth Amendment to the United States Constitution.

125.    The actions of defendants under color of state law deprived plaintiff of the rights, privileges and immunities under the laws and Constitution of the United States in violation of 42 U.S.C. §§ 1983, 1985(3) and 1986.

126.    As a direct and proximate result of these unlawful and unconstitutional practices plaintiff suffered serious physical pain and suffering, mental anguish, and psychological and emotional distress which ultimately resulted in his almost complete loss of vision.

WHEREFORE, plaintiff respectfully demands a jury trial, requests relief and judgment in his favor and against defendants and for actual, compensatory, and consequential damages (where allowed) including pain and suffering according to proof, in excess of $100,000; and pursuant to

42 U.S.C. § 1988, for punitive or exemplary damages as permitted by applicable law, in an amount believed by the trier of fact to be appropriate to punish defendants for their willful, deliberate, malicious and outrageous conduct, and to deter defendants and other employers from engaging in such misconduct in the future; for attorneys fees, costs and expert fees; for prejudgment interest including delay damages; constitutional damages allowed by law; for prospective and equitable relief in that defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom and are to be ordered to promulgate an effective policy against such practices and to adhere thereto and for such other, different or further relief as the interests of justice or equity may require.

## COUNT THREE
### Negligence/Corporate Negligence

127.    Plaintiff incorporates herein by reference all averments set forth in the preceding paragraphs as though same were set forth in full herein**.**

128.    Wexford, Corizon and CCS and CCSCH acted through their agents, servants and/or employees, including nurses, physician assistants, physicians and other health care providers.

129.    Wexford and/or Corizon and/or CCS and CCSCH also acted through and together with the City of Philadelphia and DOC in their negligent acts.

130.    Defendants had a duty of care to plaintiff.

131.    Plaintiff's injuries were caused by the negligence of Wexford, Corizon and CCS and CCSCH including as follows:

a.      Failing to recognize the signs and symptoms of corneal implant rejection

b.      Failing to transfer plaintiff for appropriate medical care and follow-up appointments.

     c.        Failing to provide the needed hard lens for his "good" eye, thereby causing it to deteriorate as well.

     d.        Failing to provide the needed medication for plaintiff's eyes.

     e.        Failing to communicate with the guards and prison personnel regarding plaintiff's condition.

     f.        Ignoring plaintiff's complaints.

     g.        Failing to recognize or appreciate the effect of lack of medication on plaintiff's condition.

     h.        Failing to establish and enforce policies, procedures and protocols regarding patients in need of immediate medical care and treatment.

     i.        Failing to establish and enforce policies, procedures and protocols regarding the communication of inmate's medical conditions with prison guards and personnel

     j.        Failing to adequately train and supervise medical professionals and healthcare providers at PICC and DOC facilities.

132.    Defendants breached that duty.

133.    Defendants' actions were the proximate cause of injury and blindness.

134.    As a result of defendants' negligence plaintiff suffered damages.

WHEREFORE, plaintiff respectfully demands a jury trial, requests relief and judgment in his favor and against defendants and for actual, compensatory, and consequential damages (where allowed) including pain and suffering according to proof, in excess of $100,000; for punitive or exemplary damages as permitted by applicable law, in an amount believed by the trier of fact to be appropriate to punish defendants for their willful, deliberate, malicious and outrageous conduct, and to deter defendants and other employers from engaging in such misconduct in the

future; for attorneys fees, costs and expert fees; for prejudgment interest including delay

damages; constitutional damages allowed by law; for prospective and equitable relief in that

defendants are to be prohibited from continuing to maintain their illegal policy, practice, or

custom and are to be ordered to promulgate an effective policy against such practices and to

adhere thereto and for such other, different or further relief as the interests of justice or equity

may require.

**COUNT FOUR**
**Breach of Contract Claim**
**Against Defendants Wexford and Corizon/PHS and CCS and CCSCH**

135.    Plaintiff incorporates herein by reference all averments set forth in the preceding

paragraphs as though same were set forth in full herein.

136.    There were separate contracts between Wexford, Corizon/PHS, CCS and CCSCH and

the Pennsylvania Department of Corrections ("DOC") or the City of Philadelphia during the

relevant time.

137.    It is believed and therefore averred that the contract contained promises and

contractual terms that defendants would provide medical services to inmates in facilities operated

by the DOC or the City of Philadelphia.

138.    It is believed and therefore averred that the express language of the contract indicates

that inmates are to receive the benefit of the performance.

139.    The circumstances of this case are so compelling that plaintiff should have standing

to enforce the contract.

140.    No other medical care was available to plaintiff.

141.    Plaintiff was given no care or such substandard care for such a significant period of

time that he lost a significant part of his vision.

142.    Plaintiff should have standing under the contract.

143.    Plaintiff reasonably relied to his detriment on these promises made under the contract.

144.    In failing to provide medical services to inmate plaintiff defendant breached the contract.

145.    Defendants had a duty to fulfill the obligations of the contract.

146.    Defendants' breach of the contract proximately caused damages to plaintiff which were within the contemplation of the parties when the promises were made, in an amount to be determined at trial, in an amount in excess of $100,000.

WHEREFORE, plaintiff respectfully demands a jury trial, requests relief and judgment in his favor and against defendants and for actual, compensatory, and consequential damages (where allowed) including pain and suffering according to proof, in excess of $100,000; for punitive or exemplary damages as permitted by applicable law, in an amount believed by the trier of fact to be appropriate to punish defendants for their willful, deliberate, malicious and outrageous conduct, and to deter defendants and other employers from engaging in such misconduct in the future; for attorneys fees, costs and expert fees; for prejudgment interest including delay damages; constitutional damages allowed by law; for prospective and equitable relief in that defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom and are to be ordered to promulgate an effective policy against such practices and to adhere thereto and for such other, different or further relief as the interests of justice or equity may require.

## COUNT FIVE
## State Constitutional Claims

147.    Plaintiff incorporates herein by reference all averments set forth in the preceding paragraphs as though same were set forth in full herein.

148.    Defendants' conduct violated plaintiffs' rights under Article I, § 1 and/or Article I, § 13 of the Pennsylvania Constitution and the laws of the Commonwealth of Pennsylvania.

149.    The state prison system manages and directs defendants Wexford, Corizon/PHS and CCS and CCSCH as a contractor for medical services   These defendants make large sums of money for providing deficient services to incarcerated individuals unable to get medical care elsewhere.

150.    At all times relevant hereto the prison and defendants had actual knowledge that defendants' personnel were to treat prisoners with serious eye disease pursuant to constitutional medical standards.

151.    At all times relevant hereto the prison and defendants had actual knowledge that Wexford, Corizon/PHS and CCS and CCSCH had a history of unconstitutional medical care for prisoners.

152.    Despite their actual knowledge of those unconstitutional and unlawful practices, neither the prison system nor defendants has taken steps to prohibit these practices even after numerous lawsuits and settlements or otherwise supervise these vendors.

153.    By inaction in the face of actual knowledge defendants implicitly and explicitly tolerate, sanction and approve of these practices.

154.    On information and belief, defendants do not train or supervise their personnel in the appropriate manner in regard to constitutional medical care for prisoners with medical needs regarding their vision.

155.    Such actions, or lack of action, are defendants' policy and practice.

156.     As a direct and proximate result of these unlawful and unconstitutional practices plaintiff suffered serious physical pain and suffering, mental anguish, and psychological and emotional distress.

157.     Defendants' conduct violated plaintiffs' rights under Article I, § 1, a self-executing provision, and/or Article I, § 13 of the Pennsylvania Constitution and the laws of the Commonwealth of Pennsylvania.

158.     Defendants should be estopped from continuing to ignore plaintiff's health needs and the deterioration of his vision.

WHEREFORE, plaintiff respectfully demands a jury trial, requests relief and judgment in his favor and against defendants and for actual, compensatory, and consequential damages (where allowed) including pain and suffering according to proof, in excess of $100,000; for punitive or exemplary damages as permitted by applicable law, in an amount believed by the trier of fact to be appropriate to punish defendants for their willful, deliberate, malicious and outrageous conduct, and to deter defendants and other employers from engaging in such misconduct in the future; for attorneys fees, costs and expert fees; for prejudgment interest including delay damages; constitutional damages allowed by law; for equitable relief in that defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom and are to be ordered to promulgate an effective policy against such practices and to adhere thereto and for such other, different or further relief as the interests of justice or equity may require.


Respectfully submitted,

*Suzanne G. Nescott*

_____
Lynanne B. Wescott
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I, Lynanne B. Wescott, served the foregoing Complaint on the following persons by ECF

service according to the rules of ECF on the date below and will personally serve the new

defendants.

Kenneth Powell, Esquire
Caitlin Goodrich, Esquire
Weber Gallagher
2000 Market Street 13th Floor
Philadelphia, PA   19103

Regina Law, Esquire
City of Philadelphia
1515 Arch Street 14th Floor
Philadelphia, PA   19102

Stephen Siegrist, Esquire
O'Connor Kimball LLP
Two Penn Center Plaza, Suite 1100
Philadelphia, PA   19102

Barry Kramer, Esquire
PA Office of Attorney General
Senior Deputy Attorney General
21 S. 12th Street, 3d Floor
Philadelphia, PA   19107

_____
Lynanne B. Wescott

Dated:  February 25, 2015