IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CORNISH                    :           CIVIL ACTION
                                :
                                :
            v.                  :
                                :
                                :
CITY OF PHILADELPHIA, et al.    :           NO. 14-6920

MEMORANDUM

Bartle, J.                                          August 18, 2015

        Plaintiff John Cornish ("Cornish"), a state prisoner,
has filed suit against the City of Philadelphia (the "City"),
the Pennsylvania Department of Corrections ("DOC"), certain DOC
officials, four corporate health care entities which contract
with the City and DOC, and a number of "John Doe" corporations,
physicians, physician assistants, nurses, and nurse
practitioners.  Cornish seeks damages for violations of:  the
Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et
seq.; and 42 U.S.C. §§ 1983, 1985, and 1986.  His first amended
complaint also pleads state law negligence and state law
constitutional claims, as well as a state law breach-of-contract
claim against the corporate entities.  The gravamen of his
action concerns the allegedly inadequate eye care he has
received while incarcerated.  As a result, he asserts he is now
seriously visually impaired.

In orders dated May 26, 2015 and June 30, 2015, we dismissed a number of Cornish's claims as to certain defendants. Among the claims remaining are a state law negligence claim against DOC and a § 1983 claim against Christopher Oppman ("Oppman") and Joseph Korszniak ("Korszniak"), both of whom are alleged to be DOC health care officials.  Now before the court are the motion of DOC for judgment on the pleadings or, in the alternative, for summary judgment on the remaining claim against it (Doc. # 61) and the motion of Oppman and Korszniak for judgment on the pleadings or, in the alternative, for summary judgment on the remaining claim against them (Doc. # 69).

I.

The standard for evaluating a motion for judgment on the pleadings pursuant to Rule 12(c) "is the same as the familiar standard used for evaluating a motion to dismiss under Rule (12)(b)(6)."  Accurso v. Infra-Red Servs., Inc., 23 F. Supp. 3d 494, 499 (E.D. Pa. 2014) (internal citations omitted). Accordingly, "the distinction between a motion under 12(b)(6) and a motion under 12(c) 'is purely formal.'"  Id. (quoting Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990)).

Therefore, insofar as the movants seek judgment on the pleadings, the standard used for a motion to dismiss under Rule 12(b)(6) guides our determination.  When ruling on such a motion, the court must accept as true all factual allegations in

-2-

the complaint and draw all inferences in the light most favorable to the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Umland v. Planco Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008).  We must then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  Instead, the complaint must contain factual matter sufficient to state a claim that is facially plausible, meaning that "the plaintiff [has] plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  A complaint which "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility.'"  Id. (citing Twombly, 550 U.S. at 557).

If a party seeking judgment on the pleadings presents to the court "matters outside the pleadings," and the court does not exclude them, "the motion must be treated as one for summary

-3-

judgment under Rule 56." Fed. R. Civ. P. 12(d).  If the court

does so, the nonmoving party must receive "notice and an

opportunity to oppose the motion." E.g., Berry v. Klem, 283 F.

App'x 1, 3-4 (3d Cir. 2008) (citing Hancock Indus. v. Schaeffer,

811 F.2d 225, 229 (3d Cir. 1987)).

Summary judgment is appropriate "if the movant shows

that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).[1]  A dispute is genuine for summary judgment purposes if the

evidence is such that a reasonable factfinder could return a

verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 254 (1986).  Summary judgment is granted where there

_____

1.  Rule 56(c)(1) states:

> A party asserting that a fact cannot be or is
> genuinely disputed must support the assertion
> by . . . citing to particular parts of
> materials in the record, including
> depositions, documents, electronically stored
> information, affidavits or declarations,
> stipulations . . . , admissions, interrogatory
> answers, or other materials; or . . . showing
> that the materials cited do not establish the
> absence or presence of a genuine dispute, or
> that an adverse party cannot produce
> admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

is insufficient record evidence for a reasonable factfinder to find
for the plaintiffs.  Id. at 252.  "The mere existence of a
scintilla of evidence in support of the plaintiff's position will
be insufficient; there must be evidence on which the jury could
reasonably find for the plaintiff."  Id.

When ruling on a motion for summary judgment, we may
only rely on admissible evidence.  See, e.g., Blackburn v. United
Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).  We view the
facts and draw all inferences in favor of the nonmoving party.  In
re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).
However, "an inference based upon a speculation or conjecture does
not create a material factual dispute sufficient to defeat entry of
summary judgment."  Robertson v. Allied Signal, Inc., 914 F.2d 360,
382 n.12 (3d Cir. 1990).

## II.

The facts set forth in the first amended complaint,
taken in the light most favorable to Cornish, are as follows.
Oppman and Korszniak are both officials of DOC.  Oppman serves as
DOC's Director of Health Services, while Korszniak is the
Corrections Health Care Administrator for the State Correctional
Institution at Graterford ("SCI Graterford").  In his pleading,
Cornish states that Oppman and Korszniak "are referred to herein
together with DOC where individual actions are performed."  He

further avers that "employees of . . . DOC were involved in Mr. Cornish's medical care."

DOC, in operating its correctional facilities, contracts with private health care corporations in order to provide medical care to inmates.[2]  The health care corporations, in turn, employ the practitioners who administer health care services.  These corporations sometimes refer prisoners to outside specialists pursuant to their contracts with DOC.

Cornish has been housed in DOC facilities since the spring of 2013, when he was transferred to the custody of the Commonwealth from the custody of the City of Philadelphia.  Since that time he has been confined at the State Correctional Institution at Camp Hill ("SCI Camp Hill") or at SCI Graterford.

At some point during his time in City custody, Cornish began to experience problems with his eyes, particularly his left eye.  His early symptoms included blurred vision, sensitivity to bright light, difficulty seeing at night, and headaches, as well as significant pain in the eye itself.  Cornish was diagnosed with keratoconus[3] and ultimately required a type of eye surgery known as

---

2.  Among the corporations with which DOC contracts are the following defendants:  Wexford Health Sources, Inc.; Corizon; Correct Care Solutions, LLC; and CCS Correctional Healthcare.

3.  According to Cornish, keratoconus "occurs when the cornea, the clear, dome-shaped front surface of the eye, thins and gradually bulges outward into a cone shape . . . caus[ing]"

penetrating keratoplasty.[4]  At one point he also suffered from a

hordeolum, which is a painful infection afflicting the eyelid.[5]

    While in City custody and after being transferred to the

custody of DOC, Cornish has repeatedly sought care for his

condition.  The care he has received, according to Cornish, has

been sporadic and inadequate.  Specifically, he recounts that he

experienced significant delays when attempting to obtain necessary

care from outside specialists.  When he was seen by those

specialists, DOC frequently rendered him unable to schedule

follow-up appointments, even when his doctors recommended them.  At

one point while Cornish was housed at SCI Camp Hill, his doctor

warned that "it is CRITICAL you see your ophthalmologist at

Wills Eye" within a week.  This information was also given to

the guards who had accompanied Cornish from the prison, with the

instructions that the message should be relayed to the medical

staff at SCI Camp Hill.  Nonetheless, Cornish was not scheduled

---

blurred vision and . . . sensitivity to light and glare."
Cornish states that as the condition progresses, "a special
rigid gas permeable contact lens is needed."  In its advanced
stages, keratoconus "may require surgery."

4.  Cornish describes penetrating keratoplasty as "the
replacement of the host cornea with a donor cornea."

5.  Cornish states that in addition to being "painful,
erythematous, and localized," a hordeolum "may produce edema of
the entire [eye]lid.  Purulent material exudes from the eyelash
line in external hordeola, while internal hordeola suppurate on
the conjunctival surface of [the] eyelid."

to see the ophthalmologist for more than two months.  On another occasion, while Cornish was housed at SCI Graterford, his doctor recommended during an appointment that Cornish be scheduled for a follow-up visit within four to six weeks.  No such visit was scheduled, and Cornish was instead moved back to SCI Camp Hill. During the relevant time period he was transferred several times between detention facilities, but his medical records were not transferred with him.

Cornish also experienced striking delays in access to the eye medications and contact lenses which his doctors prescribed to him.  Cornish notes that the staff at Wills Eye, the hospital at which his specialist was located, contacted SCI Graterford "multiple times" about the insurance payments needed in order for the rigid contact lens to be provided.  The hospital also provided the prison medical staff with instructions on how to arrange for payment for the lens.  At one point, Cornish was denied his eye drops for at least 26 days during a temporary transfer to restrictive housing, despite his repeated requests.  Due to lack of proper medication, Cornish's left eye ultimately rejected the cornea which had been transplanted during the surgery.  Cornish pleads specifically that "[w]hile at SCI Graterford he was not properly medicated for his eye problem which ultimately triggered a rejection of the transplant."

-8-

Meanwhile, Cornish's condition has worsened significantly.  He describes persistent facial swelling, vision loss, weakness, and "burning throbbing headaches."  The vision in his right eye has deteriorated markedly as a result of that eye having to compensate for the left-eye vision loss.  Cornish pleads that this damage to his right eye could have been avoided or mitigated had he been provided with the recommended rigid contact lens.  Cornish's left eye is now permanently damaged, and he will have to use eye drops for the rest of his life.  His right eye also remains impaired.

Cornish alleges in his first amended complaint that Oppman and Korszniak, as well as other DOC officials, "knew about and acquiesced in the medical providers['] failure to treat [his] eye condition."

III.

The movants first seek judgment in their favor on the basis that Cornish has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("federal PLRA"), 42 U.S.C. § 1997e, and the Pennsylvania Prison Litigation Reform Act ("Pennsylvania PLRA"), 42 Pa. Cons. Stat. Ann. § 6603(b).  In support of this argument, DOC attaches to its memorandum the declarations of Wendy Shaylor ("Shaylor") and Deborah Alvord ("Alvord"), the Grievance Coordinators for SCI Graterford and SCI Camp Hill.  Oppman and Korszniak make

reference to these declarations in their memorandum.  The
declarations of Shaylor and Alvord, in turn, state that the
grievance procedure for state inmates is set forth in a document
entitled DC-ADM-804.  The declarations provide an internet
address at which DC-ADM-804 can be located.  Both Shaylor and
Alvord briefly describe the grievance procedure and declare that
Cornish never filed a grievance pursuant to DC-ADM-804 while in
the custody of the Commonwealth.

　　　　In his briefs in response to both motions, Cornish
states that "[b]ecause defendant has raised an exhaustion
defense and submitted evidence in support of that defense, that
section of the motion is converted to a motion for summary
judgment as to that issue."  He attaches to his response to
DOC's motion a printout of DC-ADM-804 which, according to the
brief, his counsel obtained by navigating to the internet
address provided in Shaylor and Alvord's declarations.  The
version of DC-ADM-804 available on the website, and submitted by
Cornish, displays a "date of issue" of April 27, 2015 and an
"effective date" of May 1, 2015.  We note that all of the
conduct complained of by Cornish took place before either of
these two dates.

　　　　As an initial matter, we will treat the motions of
DOC, Oppman, and Korszniak as motions for summary judgment
insofar as they are premised on Cornish's alleged failure to

-10-

exhaust.  Cornish had adequate notice of our intent to construe the motions in this way, as demonstrated by the statement in his briefs that the motions must be converted to motions for summary judgment and his submission of material outside the pleadings on the issue of exhaustion.  See Fed. R. Civ. P. 12(d); Berry, 283 F. App'x at 3-4.

The federal PLRA provides, in relevant part, that "no action shall be brought with respect to prison conditions under [§ 1983] or any other Federal law[] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This exhaustion requirement "specifically mandates that inmate-plaintiffs exhaust their available administrative remedies," and courts lack the power "to excuse compliance with the exhaustion requirement."  Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (internal citations omitted).  Failure to exhaust as required by the federal PLRA is an "affirmative defense to be pleaded by the defendant."  Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

Though the federal PLRA applies only to claims pleaded under federal law, Pennsylvania has enacted its own version of the PLRA which is modeled after the federal statute.  See Payne v. Comm. Dep't of Corrs., 871 A.2d 795, 800 (Pa. 2005).  Unlike the federal PLRA, the Pennsylvania PLRA does not contain an

exhaustion requirement on its face.  However, § 6602(e)(2) of
the Pennsylvania statute permits courts to dismiss prison
conditions litigation at any time upon a determination that the
"defendant is entitled to assert a valid affirmative defense."
Pennsylvania courts have held that failure to exhaust is among
these affirmative defenses.  E.g., Watson v. Pa. Dep't of
Corrs., 990 A.2d 164, 167-68 (Pa. Commw. Ct. 2010).

In order to exhaust his administrative remedies as
required by the PLRA, an inmate-plaintiff must "substantial[ly]
compl[y] with the prison's grievance procedures."  Small v.
Camden Cnty., 728 F.3d 265, 272 (3d Cir. 2013) (internal
citations omitted).  However, our Court of Appeals has refused
to "condition exhaustion on unwritten or 'implied'" grievance
requirements.  Jackson v. Ivens, 244 F. App'x 508, 514 (3d Cir.
2007) (citing Spruill v. Gillis, 372 F.3d 218, 234 (3d Cir.
2004)).  Where nothing in a prison's grievance policy could have
put an inmate-plaintiff on notice of the required procedures,
the inmate-plaintiff's failure to comply with those procedures
does not give rise to an exhaustion defense under the PLRA.
Spruill, 372 F.3d at 234.  Other appellate courts have noted
that the PLRA requires inmate-plaintiffs to exhaust only
"available" remedies, and a remedy cannot be considered
"available" if "essential elements of the procedure for
obtaining it are concealed."  Hurst v. Hantke, 634 F.3d 409, 411

-12-

(7th Cir. 2011); see also Bryant v. Rich, 530 F.3d 1368, 1373
(11th Cir. 2008).

Here, the movants urge that Cornish was required to
exhaust the grievance procedures set forth in DC-ADM-804 before
filing suit.  However, the version of DC-ADM-804 referenced in
the affidavits of Shaylor and Alvord (as well as in the movants'
briefs) states on its first page an issue date of April 27, 2015
and an effective date of May 1, 2015.  Cornish filed his amended
complaint on February 26, 2015, months before either of these
dates.  The movants have therefore failed to demonstrate that
Cornish did not adequately exhaust the remedies available to him
before filing suit.  Needless to say, Cornish was not obligated
to comply with administrative procedures which had not yet been
issued.

DOC urges that Cornish "never contends – whether in is
pleadings or in his declaration . . . – that he was unaware of
prison grievance procedures."  Nor has Cornish contended that he
was affirmatively prevented from accessing the prison grievance
procedures, according to DOC.  Oppman and Korszniak make similar
contentions.  Their arguments, however, are unavailing.
Though DOC insists that it had procedures in place in 2013 and
2014, the only actual procedures to which it directs our
attention are those listed in the version of DC-ADM-804 which
went into effect on May 1, 2015.  Moreover, it is not Cornish's

-13-

burden to show that he was unaware of, or lacked access to, the prison's grievance procedures.  As noted above, failure to exhaust under the federal PLRA and the Pennsylvania PLRA is an affirmative defense.  See Ray, 285 F.3d at 295; Watson, 990 A.2d at 167-68.

DOC further argues that it does not matter that the cited version of DC-ADM-804 did not become effective until May 2015 because "this is a case where Plaintiff filed nothing whatsoever even resembling a grievance."  Again, this argument misses the mark.  The movants have pointed to no evidence in the record of administrative remedies which were available to Cornish at the time of the disputed conduct.  As a result, he cannot be faulted for a failure to exhaust any such remedies. See Hurst, 634 F.3d at 411; Spruill, 372 F.3d at 234.

DOC attaches to its reply brief a document entitled "receipt of inmate handbook & administrative directives" and a second document entitled "receipt of facility inmate handbook supplement," both signed by Cornish.  Oppman and Korszniak incorporate these exhibits into their own reply brief.  The receipts, however, provide no detail about the contents of the handbook, handbook supplements, or directives purportedly received by Cornish.  As exhibits to the DOC's reply brief, the receipts are not part of the record before us.  They do not change our conclusion that nothing in the record shows a failure

-14-

by Cornish to comply with administrative procedures which were available to him.

In sum, we construe the motions of DOC, Oppman, and Korszniak for judgment on the pleadings as motions for summary judgment insofar as they are based on Cornish's purported failure to exhaust his administrative remedies.  Because the moving defendants have pointed to no evidence in the record that Cornish failed to exhaust available remedies, we will deny their summary judgment motions.

IV.

DOC further seeks judgment in its favor on the ground that it is entitled to sovereign immunity from Cornish's state-law negligence claim.[6]  It styles its motion as one for judgment on the pleadings.  Although we construed DOC's motion as a motion for summary judgment insofar as it was based on Cornish's purported failure to exhaust, DOC has attached no exhibits or other materials in support of its sovereign immunity argument.  To the extent that DOC's motion is based on its claim of sovereign immunity, we will interpret it as a motion for judgment on the pleadings.

The Commonwealth and its agencies enjoy broad sovereign immunity, which is twofold.   See Lombardo v. Pa. Dep't

---

[6].  Oppman and Korszniak do not advance this argument.

-15-

of Pub. Welfare, 540 F.3d 190, 193 (3d Cir. 2008).  First, the
Commonwealth is generally immune from suit in federal court as a
result of the Eleventh Amendment to the United States
Constitution,[7] but this immunity can be waived.  Id. at 193-94,
197.  DOC has previously conceded that it waived its Eleventh
Amendment immunity when this matter was removed from state to
federal court.  Second, the Commonwealth and its agencies still
enjoy the benefit of sovereign immunity under Pennsylvania law.
Id. at 195; 42 Pa. Cons. Stat. Ann. § 8521.  That sovereign
immunity is waived for only nine narrow categories of conduct.
42 Pa. Cons. Stat. Ann. § 8522(b).[8]  Among those categories is

---

7.  The Eleventh Amendment provides that "[t]he Judicial power of
the United States shall not be construed to extend to any suit in
law or equity, commenced or prosecuted against one of the United
States by Citizens of another State or by Citizens or Subjects of
any Foreign State."  U.S. Const. amend. XI.  Beyond the plain
meaning of its text, the Eleventh Amendment has also been construed
to bar federal lawsuits by citizens against their own states and
their states' agencies except in limited circumstances.  Idaho v.
Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267-68 (1998); Hans v.
Louisiana, 134 U.S. 1 (1890).

8.  Specifically, § 8522 provides that liability may be imposed
"for damages arising out of a negligent act where the damages
would be recoverable under the common law or a statute creating
a cause of action if the injury were caused by a person not
having available the defense of sovereign immunity" and if the
damages at issue were caused by one of the following:
"[v]ehicle liability"; "[m]edical-professional liability";
"[c]are, custody, or control of personal property";
"Commonwealth real estate, highways and sidewalks"; "[p]otholes
and other dangerous conditions"; "[c]are, custody or control of
animals"; "[l]iquor store sales"; "National Guard activities";
and "[t]oxoids and vaccines."  42 Pa. Cons. Stat. Ann. § 8522.

one which permits lawsuits against the Commonwealth for "[a]cts of health care employees of Commonwealth agency medical facilities or institutions or by a Commonwealth party who is a doctor, dentist, nurse or related health care personnel.  Id. § 8522(b)(2).  Oppman, we note, was DOC's Director of Health Services and Korszniak was the Corrections Health Care Administrator at SCI Graterford.

DOC now argues that it is entitled to sovereign immunity from Cornish's state-law negligence claim pursuant to § 8521.  It contends that the conduct of which Cornish complains does not fall within the scope of the medical-professional liability exception of § 8522(b)(2).  In support of its position, DOC cites the Pennsylvania Supreme Court's decision in Moser v. Heistand, 681 A.2d 1322 (Pa. 1996).  There, the court was concerned with whether § 8522(b)(2) permits a plaintiff to proceed with a corporate liability claim against a state-owned medical facility.  The court recognized that the corporate liability upon which the Moser plaintiffs relied was premised on "the breach of non-delegable duties that a hospital owes directly to its patients."  681 A.2d at 1326.  For example, when a physician who is an employee of a hospital commits malpractice during an operation, the hospital is liable under the doctrine of respondeat superior.  However, if the hospital is sued for allowing an incompetent physician to practice there, the

-17-

hospital is liable under the doctrine of corporate liability. This corporate negligence is "independent of the negligence of the hospital's employees or ostensible agents," and gives rise to a cause of action "from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees." Id. This type of corporate negligence, the Moser court concluded, does not fall within the scope of § 8522(b)(2)'s waiver of state sovereign immunity. Though that exception "waive[d] sovereign immunity for the negligent acts of specified individuals . . . working at or for a Commonwealth institution," the Moser court held that it did "not waive sovereign immunity for individuals who act as the corporate entity." Id.

Federal courts, adopting the reasoning of Moser, have ruled that the state sovereign immunity statute shields Commonwealth-run medical facilities from suit for the negligent acts of the facilities themselves even though they may be liable under § 8522(b)(2) for the acts of their employees on a theory of respondeat superior. See, e.g., Thrower v. Pennsylvania, 873 F. Supp. 2d 651, 658-59 (W.D. Pa. 2012); Brown v. Commonwealth, No. 99-4901, 2000 WL 562743, at *3 (E.D. Pa. May 8, 2000); Lor v. Commonwealth, No. 99-4809, 2000 WL 186839, at *4 (E.D. Pa. Feb. 4, 2000). The Commonwealth Court of Pennsylvania has also relied on Moser to find that § 8521 immunizes Commonwealth-run

-18-

medical facilities from liability for their own "institutional, administrative negligence."  <u>Dashner v. Hamburg Ctr. Dep't of Pub. Welfare</u>, 845 A.2d 935, 939 (Pa. Commw. Ct. 2004).

DOC directs our attention to the opinion of the Commonwealth Court in <u>McCool v. Dep't of Corr.</u>, 984 A.2d 565 (Pa. Commw. Ct. 2009).  This case does not help DOC.  There, the state court concluded that an inmate-plaintiff's medical liability claims against DOC and its Secretary and its Deputy Secretary for Administration[9] were properly dismissed on the basis of sovereign immunity because those individual defendants were not "health care employees of a Commonwealth agency" as contemplated by § 8522(b)(2).  <u>Id.</u> at 570.  Since these two individuals were not health care employees, no respondeat liability of the DOC would attach as a result of their conduct. <u>Id.</u>  The court went on to note that § 8522(b)(2) might apply to the conduct of an additional defendant, the Director of Prison Health Care Services at the State Correctional Institution at Forest.  <u>Id.</u> at 570-71.  However, it found that the plaintiff's claims against that defendant had been properly dismissed for reasons unrelated to sovereign immunity.  <u>Id.</u> at 571.  In sum,

---

9.  The DOC Deputy Secretary for Administration was named in the <u>McCool</u> plaintiff's complaint as "Department Director of the Bureau of Health Care."  When the defendants explained this in their answer, the plaintiff sought to amend his complaint, though the court dismissed his claims without deciding his motion to amend.

each of the individual defendants in <u>McCool</u> was either not a health care official or had the claims against him dismissed on unrelated grounds.  Here, in contrast, Oppman and Korszniak are alleged to be health care employees of DOC.  <u>McCool</u> is therefore distinguishable.

Cornish's negligence claim against DOC is based, at least in part, on a theory of respondeat superior.  As noted above, Cornish refers specifically to the actions of DOC health care officials Oppman and Korszniak.  He avers that the two "are referred to [in the pleading] together with DOC where individual actions are performed."  Cornish also bases his negligence claim in part on actions taken by correctional health care employees. He describes the failure of these employees properly to communicate with one another and with his doctors and their allegedly inadequate efforts to procure the proper medications and lenses for his condition.  Cornish pleads that Oppman, Korszniak, and other prison officials "knew about and acquiesced in the medical providers['] failure to treat [his] eye condition."  These allegations provide the basis for a respondeat superior theory of negligence against DOC, and insofar as Cornish's claim is grounded in such a theory, it withstands DOC's claim of sovereign immunity.  See <u>Moser</u>, 681 A.2d at 1326.

Accordingly, we will deny DOC's motion for judgment in its favor on Cornish's negligence claim insofar as that claim pleads respondeat superior liability.